IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. _____ |
| v. | : | DATE FILED:   November 4, 2013 |
| JANSSEN PHARMACEUTICALS, INC. | : | VIOLATION: 21 U.S.C. § 331(a), 333(a)(1) (introduction of a misbranded drug into interstate commerce - 1 count) |
| | : | |
| | : | Notice of Forfeiture |

## INFORMATION

### COUNT ONE

THE UNITED STATES ATTORNEY CHARGES THAT:

At all times material to this information:

### BACKGROUND

1.      Defendant JANSSEN PHARMACEUTICALS, INC. (JPI) is a wholly-owned subsidiary of Johnson & Johnson (J&J).   JPI is a Pennsylvania corporation headquartered in Titusville, New Jersey.   JPI was previously named ORTHO-McNEIL-JANSSEN PHARMACEUTICALS, INC. (OMJPI), and was renamed JPI effective June 22, 2011.   J&J had created OMJPI in a corporate reorganization effective on December 31, 2007, by transferring all of the assets and liabilities (except those that could not be transferred) of its wholly-owned subsidiary Ortho-McNeil Pharmaceutical, Inc. to its wholly-owned subsidiary Janssen Pharmaceutica, Inc.   Upon that reorganization, Janssen Pharmaceutica, Inc. became known as OMJPI.

2.      Janssen Pharmaceutica, Inc. (Janssen) was a wholly-owned subsidiary of J&J, incorporated in Pennsylvania, with its headquarters in Titusville, New Jersey.  As relevant to this information, between December 1993 and December 2007, Janssen, as a corporation and as the general partner of Janssen Pharmaceutica Products, L.P., a limited partnership, and in coordination with other J&J subsidiaries, sold and distributed, and caused the distribution of, pharmaceutical drugs throughout the United States, including in the Eastern District of Pennsylvania.

3.      Risperdal was and is the trade name of Janssen's drug product risperidone, a prescription drug of a class known as atypical antipsychotics.  Risperdal was one of the pharmaceutical drugs which Janssen and Janssen Pharmaceutica Products, L.P. sold and distributed in interstate commerce, as described in the preceding paragraph.

## THE DEFENDANT

4.      Janssen Pharmaceutica Inc., the predecessor corporation to defendant JPI and to OMJPI, acting through its employees and employees of Janssen Pharmaceutica Products, L.P., in the distribution and sale of Risperdal in the United States, will be referred to as "Janssen" in this information, unless otherwise specifically identified.

## REGULATORY FRAMEWORK

5.      The United States Food and Drug Administration (FDA) was the federal agency responsible for protecting the health and safety of the public by enforcing the Federal Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. § 301 et seq., and by assuring, among other things, that drugs intended for use in humans are safe and effective for their intended uses and that the labeling of such drugs bear true, complete, and accurate information.

2

6.      The FDCA, among other purposes, governed the interstate distribution of drugs for human use.  The FDCA and its implementing regulations, with exceptions not relevant here, prohibited the distribution of any new drug in interstate commerce unless and until the FDA, after an intensive application and review process, approved a New Drug Application (NDA) submitted by the drug's sponsor.  21 U.S.C. § 355.

7.      When a drug's sponsor submits a New Drug Application to the FDA, that NDA must (1) identify all of the proposed uses of the drug intended by that sponsor; (2) include data, generated in randomized and well-controlled clinical trials, that demonstrated to the FDA's satisfaction that the drug would be safe and effective for each of those intended uses; and (3) include proposed labeling setting forth detailed information about the drug with respect to those intended uses. 21 U.S.C. § 355(b).

8.      The FDCA prohibited the sponsor from introducing the new drug into interstate commerce until the FDA determined that the sponsor had presented sufficient evidence of the drug's safety and efficacy for its intended uses and approved the NDA (including the proposed labeling). 21 U.S.C. § 355(a).  Only after the FDA approved the NDA was the sponsor permitted to market the drug, and then only for the particular indications and uses specified in the approved labeling.  Indications and uses not approved by the FDA, and not included in the drug's approved FDA-labeling, were known as "unapproved" or "off-label" uses.  A determination by the FDA that a drug is safe and effective for one use does not mean that the drug is safe and effective for a different use.

9.      The FDCA and its implementing regulations required a drug sponsor to submit a supplemental New Drug Application (sNDA) to the FDA in order to market and distribute a drug for indications and uses different from those approved in a previous NDA and reflected in the

3

approved labeling. The sNDA was required to include both a description of the new intended

uses and evidence in the form of randomized and well-controlled clinical studies, sufficient to

demonstrate that the drug was safe and effective for each new intended use.   The sponsor could

not lawfully market or distribute the drug for any new intended use unless and until the FDA

approved the sNDA.

10.     Once the FDA had approved an NDA (or sNDA for new uses), any changes in the

drug's FDA-approved labeling had to be submitted to the FDA for review and approval.

11.     Under the FDCA, a drug was "misbranded" if its labeling did not bear "adequate

directions for use." 21 U.S.C. § 352(f)(1).  "Adequate directions for use" meant directions under

which a layperson could use a drug safely and effectively for the purposes for which it was

intended. 21 C.F.R. § 201.5.  A prescription drug, by definition, could not bear adequate

directions for use by a layperson.  However, an FDA-approved prescription drug could be

exempt from the adequate directions for use requirement if it met a number of requirements,

including that it was accompanied by the FDA-approved labeling, which bore adequate

information for its use "under which practitioners licensed by law to administer the drug can use

the drug safely and for the purposes for which it is intended."  A prescription drug that was

intended for unapproved, off-label uses, did not qualify for this exemption and therefore was

misbranded. 21 C.F.R. § 201.100.

12.     FDA regulations define "intended use" to include the "objective intent of the

persons legally responsible for the labeling of drugs," which intent may be demonstrated by,

among other things, "oral or written statements by such persons or their representatives" and "the

circumstances that the article is, with the knowledge of such persons or their representatives,

4

offered and used for a purpose for which it is neither labeled nor advertised." 21 C.F.R. §
201.128.

13.     The FDCA prohibited introducing, delivering for introduction, or causing the
introduction or delivery for introduction into interstate commerce, of any drug that was
misbranded.  21 U.S.C. § 331(a).

14.     The FDA's Division of Drug Marketing, Advertising, and Communications
(DDMAC), among other responsibilities, reviewed initial advertising for drug products, received
copies of certain subsequent marketing and advertising items, could provide guidance, when
asked, about the permissibility of pieces for drug marketing, and identified pieces of advertising
and marketing material that did not comply with FDA advertising regulations.

## FDA APPROVAL AND REGULATORY ACTION

15.     On or about April 15, 1992, through Janssen Research Foundation (which was
then a division of Janssen Pharamaceutica, Inc.), Janssen submitted to the FDA an NDA seeking
approval of risperidone for use as an antipsychotic.  In support of this NDA, Janssen submitted
the results of three short-term controlled clinical trials that studied the use of risperidone in
treating schizophrenic patients.

16.     On or about December 29, 1993, the FDA approved Risperdal for "the
management of the manifestations of psychotic disorders."  The "Indications" section of the
approved labeling noted that Risperdal's antipsychotic efficacy was established in short-term (6
to 8 weeks) controlled trials of schizophrenia inpatients and that long-term use had not been
systematically evaluated.

17.     As it was used in the Risperdal label approved by the FDA in 1993, the phrase
"management of the manifestations of psychotic disorders" meant management of hallucinations

5

and delusions (i.e., psychotic symptoms) and behaviors or symptoms which were a consequence of hallucinations and delusions.

18.     Risperdal's initial FDA-approved labeling also noted that there were insufficient studies on the use of Risperdal in the elderly to determine efficacy in that population.  The label stated: "Clinical studies of Risperdal did not include sufficient numbers of patients aged 65 and over to determine whether they respond differently from younger patients."

19.     Risperdal, an antipsychotic drug, has been associated with a number of serious side effects and health risks.  These side effects and health risks, which may be especially pronounced in vulnerable populations such as the elderly, include, but are not limited to: increased risk of stroke, increased risk of death among elderly dementia patients, extrapyramidal symptoms ("EPS") including tremors and dystonic reaction; tardive dyskinesia (a potentially irreversible movement disorder); elevated blood sugar; and diabetes mellitus.  Antipsychotic drugs are likely to have more serious side effects than other psychoactive medications.

20.     On or about October 14, 1994, in response to an inquiry from Janssen, DDMAC stated that it did not object to Janssen's inclusion of psychotic disorders other than schizophrenia, such as bipolar disease, psychotic depression, and schizophrenic personality disorders, in promotional materials for Risperdal, but advised that "the descriptions must be accompanied by the disclosure that Risperdal has only been studied in schizophrenic patients."  DDMAC also advised Janssen that "a focused marketing campaign targeting specific non-schizophrenic psychoses would be misleading."  DDMAC also advised Janssen that it would be misleading to suggest that Risperdal had been specifically shown to be safe and effective in the elderly.

21.     On or about January 5, 1999, DDMAC sent a letter to the Janssen Research Foundation's Director of Regulatory Affairs informing him that DDMAC had reviewed specific

6

advertising pieces by which Janssen marketed Risperdal for geriatric patients using a theme of "hostile outside, fragile inside." In this letter, DDMAC objected to these advertising pieces, stating that they were "false, misleading, and/or lacking in fair balance, and in violation of the [FDCA] and [its] regulations" because, among other reasons, the materials stated or implied that Risperdal had been determined to be safe and effective for the elderly population in particular. DDMAC explained that presentations focusing on this population were misleading because they implied that Risperdal had been found to be specifically effective in the elderly population, when this had not been shown. In fact, as the letter noted, "[t]here is limited data on the use of Risperdal in the elderly, and the elderly population was not specifically studied in the clinical trials for Risperdal." DDMAC also found that Janssen was "disseminating materials that impl[ied], without adequate substantiation, that Risperdal is safe and effective in specifically treating hostility in the elderly."

22.     On or about March 9, 1999, DDMAC replied to Janssen's response to DDMAC's January 5, 1999 letter. DDMAC told Janssen that it had consulted with the Division of Neuropharmacological Drug Products (DNDP), which reviews new drug applications for approval, and disagreed with Janssen's assertion that the FDA had authorized "relatively broad indications for this particular class of drugs." DDMAC told Janssen that the label stated that Risperdal was indicated for "the management of the manifestations of psychotic disorders . . . established in short-term (6 to 8-weeks) controlled trials of schizophrenic patients." DDMAC also told Janssen that "the safety and efficacy of Risperdal in the elderly was not particularly examined in 'fragile' individuals."

23.     On or about January 20, 1998, Janssen submitted an sNDA to the FDA seeking to expand the "Clinical Trials" section of Risperdal's label to include a claim that clinical trials

indicated a benefit of the use of Risperdal "in the treatment of the psychotic and behavioral disturbances in dementia."

24.     On or about January 20, 1999, the FDA informed Janssen that its sNDA, submitted on January 20, 1998, was not approvable because of Janssen's "failure to fully evaluate the safety of risperidone for use under the conditions" set out in the proposed labeling. The FDA noted that Janssen "failed to fully explore and explain what appeared to be an excess number of deaths" among those treated with Risperdal.  The FDA concluded by reminding Janssen that Risperdal "may be considered to be misbranded under the [FDCA] if [it is] marketed with these changes prior to approval of [the] supplemental applications."[1/]

25.     On or about September 25, 2000, the FDA sent a letter to all pharmaceutical companies, including Janssen, which had obtained FDA approval for atypical antipsychotics.  In that letter, the FDA asked "all sponsors of antipsychotic agents to revise labeling to more precisely reflect that these agents are indicated for the treatment of schizophrenia."  The FDA expressed its concern "that product labeling accurately describe the condition(s) for which approval was granted," and noted that a drug "which is indicated for psychosis, but which was studied only in patients with schizophrenia, might be inferred by the reader to be safe and effective" in diseases for which it was not studied.

26.     On or about March 3, 2002, the FDA approved a Janssen sNDA which, among other matters, changed Risperdal's approved indication to "treatment of schizophrenia," as the

---

[1/]   The FDA also noted that it did "not believe there would be any adverse consequences for patients and prescribers from a non-approval action at this time," stating that "[i]t is our impression based on IMS data that risperidone is a leading antipsychotic drug used in long term care in the US" and that "a delay in extending the labeling into this population should not impact on the availability of risperidone as a treatment alternative."

FDA had requested on September 25, 2000.  Janssen had submitted the revised labeling

reflecting this change on January 28, 2002.

27.     On or about March 28, 2003, the FDA requested the addition of a new paragraph

to the "Warnings" section of Risperdal's package insert.  This warning, which concerned

cerebrovascular adverse events, read:

> Cerebrovascular Adverse Events, Including Stroke, in Elderly Patients with Dementia:
> Cerebrovascular adverse events (e.g., stroke, transient ischemic attack), including
> fatalities, were reported in patients (mean age 85 years; range 73-97) in trials of
> risperidone in elderly patients with dementia-related psychosis.  In placebo-controlled
> trials, there was a significantly higher incidence of cerebrovascular adverse events in
> patients treated with risperidone compared to patients treated with placebo.  RISPERDAL
> has not been shown to be safe or effective in the treatment of patients with dementia-
> related psychosis.

On or about September 10, 2003, the FDA approved Janssen's request to change the last sentence

of the warning to read:  "RISPERDAL is not approved for the treatment of patients with

dementia-related psychosis."

28.     On or about November 21, 2003, the FDA approved the addition of new

paragraphs to the "Warnings" section of Risperdal's package insert.  This warning, which

concerned hyperglycemia and diabetes mellitus, read in part:

> Hyperglycemia, in some cases extreme and associated with ketoacidosis or hyperosmolar
> coma or death, has been reported in patients treated with atypical antipsychotics including
> RISPERDAL®. . . .

> Patients with an established diagnosis of diabetes mellitus who are started on atypical
> antipsychotics should be monitored regularly for worsening of glucose control. . . .

The warning paragraphs acknowledged that "the relationship between atypical antipsychotic use

and hyperglycemia-related adverse events is not completely understood," but stated that

epidemiologic studies suggested an increased risk of such events in patients treated with atypical

antipsychotics.

29.     On or about December 4, 2003, the FDA approved a Janssen sNDA to expand Risperdal's indication to include short-term treatment of acute manic or mixed Bi-Polar I episodes as adjunctive therapy in adults.

30.     On or about April 11, 2005, the FDA asked Janssen to place a Boxed Warning, also known as a "black box" warning, at the beginning of its Risperdal label to highlight the risk of increased mortality in patients with dementia-related psychosis who had been treated with atypical antipsychotic drugs, which included Risperdal. The FDA made this request to all manufacturers of atypical antipsychotic drugs. A "black box" warning is the most serious warning the FDA can require to be placed on a drug's label. On or about April 29, 2005, Janssen advised the FDA that it was adding the following "black box" warning to its Risperdal label:

Increased Mortality in Elderly Patients with Dementia-Related Psychosis

Elderly patients with dementia-related psychosis treated with atypical antipsychotic drugs are at an increased risk of death compared to placebo. Analyses of seventeen placebo controlled trials (modal duration of 10 weeks) in these patients revealed a risk of death in the drug-treated patients of between 1.6 to 1.7 times that seen in placebo-treated patients. Over the course of a typical 10 week controlled trial, the rate of death in drug-treated patients was about 4.5%, compared to a rate of about 2.6% in the placebo group. Although the causes of death were varied, most of the deaths appeared to be either cardiovascular (e.g., heart failure, sudden death) or infectious (e.g., pneumonia) in nature. RISPERDAL® (risperidone) is not approved for the treatment of patients with Dementia-Related Psychosis.

FDA regulations allowed Janssen to begin using this label on May 2, 2005, the date that the FDA received Janssen's April 29, 2005 submission.

31.     On or about May 25, 2005, the FDA denied a Janssen sNDA seeking to expand Risperdal's indication to include treatment of psychosis of Alzheimer's disease. The FDA concluded that Janssen did not provide substantial evidence of Risperdal's effectiveness in treating psychosis of Alzheimer's disease. The FDA also stated its continuing concern about the

10

increased mortality in this class of drugs, including Risperdal, in clinical trials for the elderly population in which it was examined.

32.     Risperdal was never approved by the FDA for the treatment of dementia.  Prior to March 3, 2002, treatment of behaviors or psychological symptoms of dementia could be considered among the approved indications for Risperdal only if those behaviors or symptoms were psychotic symptoms (hallucinations or delusions) or a consequence of such psychotic symptoms.  After March 3, 2002, treatment of behaviors or psychological symptoms of dementia was not an approved indication for Risperdal under any circumstances.

## SCHIZOPHRENIA AND DEMENTIA

33.     Schizophrenia is a common and serious mental disorder characterized by loss of contact with reality due to psychotic symptoms (i.e., hallucinations (false perceptions) and delusions (false beliefs)), thought disorder (i.e., loss of connection between thoughts), flattened affect (restricted range of emotions), diminished motivation, and impaired work and social functioning.

34.     The prevalence of schizophrenia is approximately 1% in the general population. Among persons age 65 and older, the prevalence is less than 1%.  The peak age of onset is 18-25 years for men and 26-45 years in women, though earlier or later onset is not uncommon.  Its specific cause is unknown, but it has a biologic basis.  Schizophrenics have a lower life expectancy than the general population; a schizophrenic dies, on average, approximately 10 years earlier than people in the general population.

35.     Dementia is very common and occurs primarily in people older than 65.  It is the reason for more than 50% of admissions to nursing homes.  Dementia in older persons most often is a slow, progressive decline in cognitive mental function including memory, language,

11

thinking, judgment, and the ability to learn new information. Dementia can arise from various causes, but most dementias in older persons are associated with Alzheimer's disease. Among the elderly population, Alzheimer's disease accounts for 50 to 70% of dementias. Alzheimer's disease affects fewer than 5% of people aged 60 to 74, 19% of those aged 75 to 84, but more than 30% of those older than 85.

36.     In 1999, the prevalence of dementia in the United States was approximately 3 million people. In that year, approximately one-half of all nursing home residents suffered from dementia (approximately 650,000 dementia patients), and approximately 90% of patients with dementia suffered from behavioral and psychological symptoms of dementia at some point in their illness.

37.     Psychotic symptoms are delusions and hallucinations. Approximately 30% to 40% of dementia patients suffer from psychotic symptoms. Conversely, 60% to 70% of dementia patients do not suffer from psychotic symptoms.

### JANSSEN'S DISTRIBUTION AND SALES OF RISPERDAL

38.     The parent company of Janssen owned the United States patent on Risperdal through a wholly owned subsidiary of the parent. Janssen had the exclusive right to sell Risperdal in the United States until the patent expired on December 27, 2007. In March of 2007, the FDA granted a 6-month extension of that exclusive right to June 29, 2008. Beginning on that date other manufacturers could offer a generic version of risperidone.

39.     The management of Janssen knew that when the company lost its exclusive right to sell Risperdal in the United States, revenues and profits from sales of Risperdal in the United States would fall substantially.

40.     Risperdal sales were very profitable for Janssen while it had the exclusive right to sell Risperdal in the United States.

41.     In older patients (patients age 65 and above) Risperdal was used far more to treat patients with dementia than to treat patients with schizophrenia.  For example, for the year ending in December 2003, according to industry-accepted third-party data, approximately 11% of Risperdal use in patients 65 years of age or older was in patients diagnosed with schizophrenia. Approximately 6% of Risperdal use in patients 65 years of age or older was in patients who were diagnosed with bipolar disorder.  Approximately 49% of Risperdal use in patients 65 years of age or older was in patients diagnosed with dementia.

42.     Other companies owned by J&J manufactured Risperdal outside the continental United States and shipped it to warehouses in New Jersey.  From there, J&J subsidiaries shipped Risperdal in interstate commerce to wholesalers and large volume customers throughout the United States for distribution to pharmacies.

43.     In 2000, Risperdal was J&J's second-highest selling pharmaceutical drug, and was Janssen's top selling drug.  Janssen's United States sales of Risperdal for the years 1994 through 2005 were as follows:

| Total U.S. Sales Risperdal | |
| --- | --- |
| Year | Sales ($ Millions) |
| 1994 | 172 |
| 1995 | 343 |

| | |
|---|---|
| 1996 | 503 |
| 1997 | 589 |
| 1998 | 695 |
| 1999 | 892 |
| 2000 | 1,083 |
| 2001 | 1,240 |
| 2002 | 1,404 |
| 2003 | 1,448 |
| 2004 | 1,602 |
| 2005 | 1,726 |

44.     Janssen had the highest market share for the use of atipsychotics in elderly patients with dementia.  For example, in May 2001, according to industry-accepted third-party data, Janssen's market share of the total use of antipsychotic drugs (both conventional and atypical) to treat dementia patients for the prior 12 months was approximately 54.3%.

45.     Beginning in approximately February 1994, and continuing beyond the end of 2005, Janssen marketed the use of Risperdal to physicians and other prescribers.

46.     As part of its efforts to market Risperdal, Janssen employed sales representatives who called on physicians and other prescribers.  Beginning in approximately 1994, these sales representatives were part of Janssen's CNS division ("CNS" stood for Central Nervous System). These sales representatives marketed the use of Risperdal by using sales messages which Janssen prepared and provided to them.  These sales representatives also marketed Risperdal to physicians and other prescribers by using sales aids and other promotional materials created and supplied by Janssen.  The sales representatives also marketed Risperdal by leaving free samples

14

of Risperdal for physicians to use in their practices. The CNS sales force principally called on psychiatrists who treated schizophrenic patients.

47.    On or about May 1, 1998, Janssen launched an "ElderCare" sales force to market Risperdal and two other prescription drugs to prescribers who treated older patients (that is, patients 65 years of age and older). In addition to office-based physicians who treated older patients, Janssen directed its ElderCare sales representatives to seek out and market Risperdal to physicians who were medical directors at nursing homes and skilled nursing facilities, directors of nursing at such facilities, and consultant pharmacists who reviewed patient charts at such facilities.

48.    As with the CNS sales force, the ElderCare sales representatives marketed Risperdal using sales messages prepared and provided by Janssen and using sales aids and other promotional materials created for the ElderCare sales force and supplied by Janssen. The ElderCare sales representatives also marketed Risperdal by leaving free samples of Risperdal for physicians to use in their practices.

49.    Janssen disbanded and terminated its ElderCare sales force in approximately November 2005.

50.    In approximately February 2002, Janssen directed its "500 Gold" sales force to market Risperdal to primary care physicians. Janssen's 500 Gold sales force was a separate existing sales force which marketed drugs to primary care physicians.

15

## MANNER AND MEANS

### JANSSEN'S INTENDED USE OF RISPERDAL

51.     From on or about May 1, 1998 through in or about November 2005, Janssen intended that Risperdal be used for indications that were not FDA-approved.

52.     From on or about May 1, 1998 through on or about March 3, 2002, Janssen developed and executed methods to market Risperdal for the treatment of behaviors and psychological symptoms associated with dementia, including behavioral disturbances associated with dementia, which were not psychotic symptoms and with no regard for whether or not they were a consequence of psychosis or psychotic symptoms, thereby intending uses for Risperdal that were not FDA-approved during that time period.

53.     From on or about March 3, 2002, through in or about November 2005, Janssen developed and executed methods to market Risperdal for the treatment of behaviors and psychological symptoms associated with dementia, thereby intending uses for Risperdal that were not FDA-approved during that time period.

54.     Janssen's ElderCare sales force promoted Risperdal to prescribers who principally treated patients who were age 65 or older, and to others who provided medical services to older patients such as nursing home staff and consultant pharmacists.

55.     Janssen's marketing team for Risperdal, also known as the Brand Team, knew that approximately 90% of the use of Risperdal in patients aged 65 and over was by patients who were not diagnosed with schizophrenia. After December 4, 2003, the Brand Team knew that approximately 84% of the Risperdal use in patients aged 65 and over was for patients who were not diagnosed with schizophrenia or bipolar disease, the only approved uses for Risperdal at that

time. The Brand Team also knew that approximately one-half of the Risperdal use in patients 65 and older was in patients with dementia.

56.     At least as of May 2002, the Brand Team knew that approximately 75% of Risperdal use was for indications not approved by the FDA.

57.     From on or about May 1, 1998 through on or about March 3, 2002, in directing its ElderCare sales force to market Risperdal to treat patients with behaviors and psychological symptoms of dementia, Janssen did not instruct its ElderCare sales force to market the use of Risperdal only for psychotic symptoms – hallucinations and delusions – and for behaviors and other psychological symptoms which were a consequence of such psychotic symptoms. Rather, the Janssen Brand Team and the Janssen managers of the ElderCare sales force directed its ElderCare sales force to market the use of Risperdal to treat all behaviors and psychological symptoms of dementia regardless of whether or not they arose from psychotic symptoms. Treatment of such behaviors and symptoms which did not arise from psychotic symptoms was not an FDA-approved use of Risperdal.

58.     From on or about March 3, 2002, through in or about November 2005, the ElderCare sales force managers directed its sales representatives to market Risperdal for treatment of behaviors and psychological symptoms of dementia, even though during this period the only FDA-approved indications for Risperdal were "treatment of schizophrenia" and, after December 2003, short-term treatment of acute manic or mixed Bi-Polar I episodes as adjunctive therapy in adults. Janssen similarly directed the sales representatives of its 500 Gold sales force with respect to Risperdal.

59.     Prior to January 2005, Janssen's ElderCare sales force compensation plan provided an incentive to ElderCare sales representatives to market Risperdal for unapproved

17

uses. Janssen paid its sales representatives a salary plus a bonus based upon sales. The purpose of the bonus portion of the compensation was to motivate sales representatives to increase use of Risperdal among their customer prescribers. Prior to January 2005, Janssen designed the bonus portion of the compensation system for ElderCare sales representatives to give more weight to sales of Risperdal than to sales of any other drug that the sales representatives marketed. Prior to 2005, Janssen calculated these bonuses based on total Risperdal sales in the sales representatives' territories or call lists, without regard to whether the Risperdal use was for an FDA-approved use or an unapproved use. This provided an incentive to the sales representatives to increase the sales of Risperdal for any use, including unapproved uses, and not just for FDA-approved uses.

60.     Janssen's Brand Team knew that patients who suffered from schizophrenia exhibited symptoms which also appeared in patients who did not suffer from schizophrenia. For example, many patients who suffered from dementia exhibited symptoms such as hostility, agitation, depression, aggression, anxiety, confusion and impulsiveness – symptoms which could also arise in a schizophrenia patient.

61.     From on or about May 1, 1998 through March 3, 2002, Janssen developed marketing campaigns, and directed its ElderCare sales representatives to execute these campaigns, to include in their marketing of Risperdal, promotion for treatment of non-psychotic symptoms such as hostility, excitement, agitation, aggression, anxiety, and depression even if these symptoms arose in non-schizophrenic or non-psychotic patients, including non-psychotic dementia patients. Janssen referred to this as a "symptoms-based" message, or a "sell to the symptoms" message. Janssen promoted Risperdal for use in treating these symptoms without reference to schizophrenia or psychosis and regardless of whether the symptoms arose as a consequence of psychotic symptoms.

18

62.     From on or about March 3, 2002, through in or about November 2005, Janssen directed its ElderCare sales force and its 500 Gold sales force to market Risperdal for the treatment of symptoms.  In response to the FDA's March 3, 2002, approval of Risperdal's label change to "treatment of schizophrenia," Janssen directed its ElderCare and 500 Gold sales forces not to change its symptom-based message for the promotion of Risperdal, and, as a consequence, Janssen continued promoting Risperdal to treat symptoms and behavioral disturbances of dementia which were not within Risperdal's indication.

63.     Janssen's Brand Team developed sales aids, dated May 2002 and February 2003, which featured symptoms or behaviors such as anxiety, agitation, depression, hostility, and confusion, as well as the symptoms hallucinations, paranoia, impulsiveness, and suspiciousness, all displayed prominently on their front covers.  Janssen intentionally did not mention schizophrenia on these front covers.  In addition, the sales aid cover did not in any way suggest that Risperdal was appropriate for treatment of those symptoms or behaviors only if they arose from schizophrenia.  Janssen directed its ElderCare and 500 Gold sales representatives to use these sales aids in marketing Risperdal, and the sales representatives did so, including for treatment of behaviors and psychological symptoms associated with dementia.

64.     Janssen provided instructions to its sales representatives for use of the May 2002 sales aid, which emphasized that its customers were more familiar with symptoms than they were with identifying a specific diagnosis, and that the sales aid had been created to help customers link symptoms with appropriate treatment, even though Risperdal was then indicated only for one specific diagnosis.  Janssen knew that during sales calls, sales representatives would many times not have enough time with a physician to go beyond using the front cover in that sales call.

19

65.     The May 2002 sales aid – the first sales aid developed for use after the label changed to "treatment of schizophrenia" in March, 2002 – included a patient profile for an elderly female patient "Helen D." The sales aid described "Helen D." as "recently placed in a nursing home," "feeling deserted and depressed," "agitated and hostile," and "experiencing delusions and hallucinations." Nowhere in the description of "Helen D." does the sales aid say that she is suffering from schizophrenia. Janssen directed its sales representatives to use this profile to "springboard" to the core message of how Risperdal can treat this patient's symptoms, and failed to direct its representatives to state that "Helen D." was suffering from schizophrenia, or that these symptoms should be treated with Risperdal only if they arose from schizophrenia.

66.     Between on or about May 1, 1998 and on or about March 3, 2002, the management of Janssen's ElderCare sales force, through its district managers, directed the sales force to market Risperdal to physicians and other prescribers for use in the treatment of dementia and non-psychotic symptoms or behaviors associated with dementia such as aggression, anxiety, agitation, and hostility, without directing the sales force to advise doctors that treatment of these symptoms or behaviors would only be within the FDA-approved indications for Risperdal if such symptoms or behaviors arose as a consequence of psychotic symptoms. The sales representatives consistently followed these directions.

67.     Between on or about March 3, 2002, and in or about November 2005, the management of Janssen's ElderCare sales force, through its district managers, directed the sales force to market Risperdal to physicians and other prescribers for use in the treatment of dementia and symptoms of dementia, even though those intended uses were not FDA-approved, and the sales representatives did so.

68.     Janssen's marketing of Risperdal to treat symptoms of dementia in elderly patients in nursing homes included marketing for treatment of those patients served by long-term care pharmacy providers.

## THE CHARGE

69.     From on or about March 3, 2002, to on or about December 31, 2003, in the Eastern District of Pennsylvania, and elsewhere, defendant

### JANSSEN PHARMACEUTICALS, INC.

introduced into interstate commerce, delivered for introduction into interstate commerce, and caused the introduction and delivery for introduction into interstate commerce of, a drug, Risperdal, which was misbranded within the meaning of Title 21, United States Code, Section 352(f)(1), in that its labeling lacked adequate directions for use.

In violation of Title 21, United States Code, Sections 331(a) and 333(a)(1).

## NOTICE OF FORFEITURE

**THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:**

1.  As a result of the violation of Title 21, United States Code, Section 331(a) set forth in this information, defendant JPI shall forfeit to the United States any quantities of Risperdal which, between March 3, 2002, and December 31, 2003, were misbranded when introduced into interstate commerce.

2.  If any of the property subject to forfeiture, as a result of any act or omission of the defendants:

> (a) cannot be located upon the exercise of due diligence;
>
> (b) has been transferred or sold to, or deposited with, a third party;
>
> (c) has been placed beyond the jurisdiction of the Court;
>
> (d) has been substantially diminished in value; or
>
> (e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the property subject to forfeiture, that is approximately $66,000,000.

All pursuant to Title 21, United States Code, Sections 334 and 853, and Title 28, United States Code, Section 246 l(c).


ZANE DAVID MEMEGER
UNITED STATES ATTORNEY

23